IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Claudine Elizabeth Jackson, | ) | C/A No.: 1:15-2932-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On May 22, 2012, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on February 28, 2012. Tr. at 102, 104, 207–12,

and 213–20. Her applications were denied initially and upon reconsideration. Tr. at 147–51, 156–57, and 172–73. On March 6, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 36–67 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 6, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–35. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 24, 2015. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 39. She completed the sixth grade. *Id.* Her past relevant work ("PRW") was as a waitress, a hotel maid, a personal attendant, and a cashier. Tr. at 82–83. She alleges she has been unable to work since February 28, 2012. Tr. at 43.

          2.     Medical History

On March 1, 2012, Plaintiff complained of rectal pain that caused painful bowel movements and difficulty, sitting, standing, and walking. Tr. at 317. She also endorsed pain in her lower back and buttocks. *Id.* Jill Peterson, M.D. ("Dr. Peterson"), described Plaintiff as walking in pain and sitting at an angle. *Id.* She noted external hemorrhoids, but no fissures, erythema, or active bleeding. *Id.*

Plaintiff presented to T. Chadwick Eustis, M.D. ("Dr. Eustis"), on March 6, 2012, for an initial consultation regarding anal pain. Tr. at 332. She complained that her pain had become almost unbearable over the last several days. *Id.* Dr. Eustis observed Plaintiff to have external decompressed hemorrhoids on the right and anterior sides of her rectum, as well as tenderness to palpation posteriorly and on the left side of her rectum. *Id.* He noted his examination was limited by Plaintiff's pain and anxiety. *Id.* He diagnosed anal or rectal pain, external hemorrhoids, anal fissure, anal spasm, adjustment disorder with anxiety, and rectal bleeding. *Id.* He prescribed medications and recommended further evaluation with a colonoscopy and anoscopy. *Id.*

Plaintiff underwent the colonoscopy on March 7, 2012. Tr. at 338. It showed internal and external hemorrhoids, a bleeding anal fissure, and a polyp in the splenic flexure. *Id.* Dr. Eustis recommended Plaintiff start a high fiber diet and prescribed Ciprofloxacin, Metronidazole, and Miralax. *Id.*

Plaintiff presented to the emergency room at Roper Hospital on April 8, 2012, with a complaint of pain in her tailbone, after sustaining a fall on a boat dock. Tr. at 431. Plaintiff demonstrated mild-to-moderate tenderness at L4-5 and mild-to-moderate lumbosacral paravertebral spasm on both sides of her low back. Tr. at 433. J. Jenkins, M.D., diagnosed a coccyx fracture. *Id.*

On April 10, 2012, Plaintiff presented to St. James-Santee Family Health Center ("SJSFHC") regarding her broken coccyx. Tr. at 314. She reported pain and requested additional pain medication. *Id.* The provider prescribed Lortab and refilled Paroxetine and Metaprolol. *Id.* He authorized Plaintiff to remain out of work until April 23. *Id.*

Plaintiff followed up with Dr. Eustis on April 19, 2012. Tr. at 390. She reported that the topical ointment had lessened her symptoms, but that her anal fissure had not healed. *Id.* She indicated she had additional pain that was associated with a fracture to her coccyx. *Id.* Dr. Eustis told her that she could continue the topical treatments, pursue Botox injections into the internal sphincter, or undergo lateral internal sphincterotomy. *Id.* He warned her of a 10% chance of permanent incontinence with the lateral internal sphincterotomy, but indicated it was the option with the best success rate. *Id.*

On April 24, 2012, a pelvic ultrasound revealed small fibroids within the myometrium and endometrial thickening. Tr. at 336.

Plaintiff presented to SJSFHC on May 4, 2012, to follow up on the fracture to her coccyx. Tr. at 311. Dr. Peterson referred Plaintiff to a gynecologist for vaginal bleeding; order a lipid panel; and refilled ibuprofen for osteoarthritis in her right hip. *Id.*

On May 8, 2012, Plaintiff underwent chemical neurolysis of the internal anal sphincter with Botox, posterior internal hemorrhoidectomy, and bilateral pudendal nerve block. Tr. at 395.

Plaintiff presented to Charleston Mental Health Center on May 17, 2012, after being referred from SJSFHC for worsening depression and an inability to regulate her emotions. Tr. at 355. James Zukauskas, LPC ("Mr. Zukauskas"), indicated Plaintiff was cooperative and participated in the session, but had an extensive history of trauma and symptoms of post-traumatic stress disorder ("PTSD"). *Id.* He scheduled Plaintiff for a visit with a psychiatrist. *Id.*

Plaintiff followed up with Mr. Zukauska for an initial clinical assessment on May 22, 2012. Tr. at 356–60. She reported worsened depression over the past year and endorsed symptoms that included irritability, anger, isolation, sleep disturbance, anhedonia, pessimism, guilt, feeling overwhelmed, fluctuating appetite, and hopelessness. Tr. at 356. She denied suicidal ideations, homicidal ideations, mania, and psychosis. *Id.* She indicated she was sexually molested by an older brother from the ages of 11 to 13 and was married to an abusive husband for 17 years. *Id.* She stated her older brother killed her husband in 1992 and died in jail. *Id.* Plaintiff indicated she experienced nightmares, hyperarousal, hypervigilance, emotional dysregulation with numbing, and avoidance. *Id.* Mr. Zukauska indicated Plaintiff had poor judgment and acknowledged, but failed to understand her problems. Tr. at 359. A mental status examination was otherwise normal. *Id.* He diagnosed PTSD. *Id.*

Plaintiff presented to William Carroll, M.D. ("Dr. Carroll"), for hip and tailbone pain on May 23, 2012. Tr. at 370. She complained of lower back pain that radiated to her buttocks, right lateral hip pain that radiated to her lateral thigh, and left heel pain. *Id.* Dr. Carroll observed Plaintiff to have no specific tenderness in her lumbar spine; a negative straight leg raise test; slight groin pain with range of motion ("ROM") of her hip; tenderness to palpation of the greater trochanter bursa; and a bump associated with Haglund's deformity on her left heel. Tr. at 370. X-rays of Plaintiff's lumbar spine showed osteophytic spurring and slight narrowing consistent with mild degenerative disc disease and x-rays of the right hip were consistent with mild osteoarthritis. *Id.* X-rays of her left knee indicated moderate degenerative changes. Tr. at 409. Dr. Carroll

administered a Depo-Medrol injection, referred Plaintiff for physical therapy and to a foot specialist, and instructed her to follow up in four weeks. Tr. at 371.

On May 24, 2012, Plaintiff reported nearly constant epigastric pain that did not worsen with eating. Tr. at 309. She complained of chest pain and tightness that caused her to wake during the night. *Id.* She endorsed radiation of the pain to her back and indicated her breathing felt strained. *Id.* Jane Cooper, RN, FNP, observed Plaintiff to have some pain to palpation in her upper epigastric region and to be anxious. *Id.* She prescribed Omeprazole for Plaintiff's epigastric symptoms and Klonopin for anxiety and instructed Plaintiff to follow up with Dr. Peterson in one week. *Id.*

Plaintiff reported improvement in her chest pain on May 30, 2012. Tr. at 308. She reported epigastric cramps, pain in her lower back and hips, and anal fissures. *Id.* Dr. Peterson instructed Plaintiff to continue Omeprazole for epigastric symptoms, to start Pravastatin for high triglycerides, and to follow up with her gynecologist, gastroenterologist, and orthopedist. *Id.*

Plaintiff presented to Jeffrey Armstrong, M.D. ("Dr. Armstrong"), with a complaint of left heel pain on May 31, 2012. Tr. at 368. Dr. Armstrong observed Plaintiff to have pain in her left foot with forced dorsiflexion/plantar flexion and along her Achilles tendon. *Id.* He indicated Plaintiff had discomfort on weight bearing and on lateral compression at the insertion point of the Achilles tendon. *Id.* He noted a large palpable bump to the posterior aspect of Plaintiff's left heel that was tender to palpation. Tr. at 369. Dr. Armstrong indicated an x-ray showed a large posterior heel spur on the

calcaneus. *Id.* He diagnosed Achilles bursitis or tendinitis and calcaneal spur. *Id.* Plaintiff opted to proceed with surgery to remove the spur and reattach the Achilles tendon. *Id.*

Plaintiff telephoned Charleston Mental Health Center on June 1, 2012, and reported increased anxiety because of her medical appointments. Tr. at 353. Mr. Zukauskas discussed relaxation and calming methods with Plaintiff. *Id.*

On June 6, 2012, Plaintiff reported occasional right shoulder pain and bilateral numbness and tingling in her hands. Tr. at 365. Plaintiff indicated the steroid injection had failed to decrease her pain and that she was unable to continue with physical therapy because her insurance provider denied coverage. Tr. at 366. Dr. Carroll encouraged Plaintiff to continue physical therapy for right greater trochanteric bursitis and referred her for an MRI of her lumbar spine. *Id.*

On June 14, 2012, an MRI of Plaintiff's lumbar spine showed facet arthropathy that was greatest at L5-S1 and mild multilevel degenerative disc disease with no central canal or foraminal narrowing. Tr. at 361.

Plaintiff followed up with Dr. Carroll on June 20, 2012, and reported occasional numbness and tingling in her bilateral legs. Tr. at 363. Dr. Carroll reviewed the MRI findings, prescribed Lortab for Plaintiff's joint pain, and referred her to a rheumatologist. *Id.*

Plaintiff presented to psychiatrist Scott D. Christie, M.D. ("Dr. Christie"), on June 21, 2012. Tr. at 381–82. She reported increased symptoms of anxiety, flashbacks, and traumatic dreams. Tr. at 381. Dr. Christie assessed PTSD, major depressive disorder, and

panic disorder without agoraphobia. Tr. at 381–82. He prescribed Klonopin, Trazodone, and Effexor XR and indicated he would consider adding Prazosin. Tr. at 382.

Plaintiff presented to Jennifer K. Murphy, M.D. ("Dr. Murphy"), for a rheumatology consultation on June 27, 2012. Tr. at 413–16. She complained of a 10-year history of joint pain. Tr. at 413. She reported dry mouth, dyspnea, headache, paresthesia, and muscle weakness. Tr. at 414–15. She complained of diffuse lower back pain to palpation, but a straight leg raising test was negative. Tr. at 415. Dr. Murphy indicated Plaintiff had pain with palpation and ROM of her bilateral shoulders and positive patellar apprehension tests in her bilateral knees. *Id.* Plaintiff demonstrated 14 positive fibromyalgia tender points. *Id.* Dr. Murphy assessed polyarthralgia, fatigue, low back pain, and unspecified myalgia and myositis. *Id.* She indicated Plaintiff's examination was not consistent with a diagnosis of rheumatoid arthritis and that Plaintiff likely had a combination of fibromyalgia and degenerative changes. *Id.* However, she noted that fibromyalgia was a "diagnosis of exclusion" and ordered lab work to be certain that testing did not indicate another diagnosis. Tr. at 415–16. She prescribed Neurontin and instructed Plaintiff to walk every other day and to attempt to lose weight. Tr. at 416.

Plaintiff underwent debridement of her left Achilles tendon and removal of the posterior heel spur on June 28, 2012. Tr. at 393–94. She presented to Dr. Carroll for her first postoperative visit on July 5, 2012. Tr. at 464. She expressed no complaints and indicated her pain was improving. *Id.* Dr. Carroll observed Plaintiff to have some tenuous skin at the inferior aspect of the wound and prescribed Keflex. *Id.*

Plaintiff followed up with Dr. Murphy on July 11, 2012. Tr. at 422. She indicated she fell on her right knee the day before and complained of pain in her low back, right hip, and right knee. *Id.* Dr. Murphy administered a Depo-Medrol injection to Plaintiff's right knee. *Id.* She recommended stretching and strengthening exercises for Plaintiff's low back and prescribed Neurontin for fibromyalgia. *Id.*

Plaintiff followed up with Dr. Christie on July 19, 2012. Tr. at 456–57. Dr. Christie noted that Plaintiff indicated she had recently had heel surgery and was using a wheelchair. Tr. at 456. Plaintiff stated the surgery had increased her stress and caused her to have several breakdowns over the last month. *Id.* She endorsed increased appetite and increased cigarette consumption. *Id.* Dr. Christie prescribed Wellbutrin to address Plaintiff's increased eating and smoking and increased Clonazepam for anxiety. Tr. at 457.

On July 26, 2012, Plaintiff indicated to Dr. Armstrong that her foot felt fine, but was still swollen. Tr. at 462. She admitted to Dr. Armstrong that she had continued to smoke almost two packs of cigarettes per day. *Id.* Dr. Armstrong observed mild edema and bruising to the left foot and discomfort with palpation at the surgical site, but Plaintiff had no signs of infection, normal sensation, and good ROM. *Id.* He removed Plaintiff's sutures, placed her in a cam walker, and instructed her to gradually increase her activity level. *Id.*

On September 4, 2012, state agency consultant Olin Hamrick, Jr., Ph. D. ("Dr. Hamrick"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 75–76. He considered Listings 12.04 for affective disorder and 12.06 for

anxiety-related disorders and found Plaintiff to have mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 75. He found that Plaintiff appeared "to have no more than Moderate limitations of work-related functions due to her MH SX related to anxiety and depression" and retained "the mental capacity to perform simple unskilled work of the type she has done in the past w/i the limits of her alleged physical conditions." Tr. at 76. Dr. Hamrick subsequently completed a mental residual functional capacity ("RFC") assessment in which he indicated Plaintiff was moderately limited with regard to the following abilities: to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. Tr. at 80–82. He concluded Plaintiff was "able to understand and remember simple instructions but could not understand and remember detailed instructions"; was "able to carry out short and simple instructions but not detailed instructions"; was "able to maintain concentration and attention for periods of at least 2 hours"; "would perform best in situations that" did "not require on-going interaction with the public"; and was "able to be aware of normal hazards and take appropriate precautions." Tr. at 82.

State agency medical consultant William Cain, M.D. ("Dr. Cain"), addressed Plaintiff's physical RFC on September 5, 2012. Tr. at 77–80. He indicated Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; frequently reach overhead with her bilateral upper extremities; and must avoid all exposure to hazards. *Id.*

Plaintiff complained to Dr. Murphy of pain in her hands, knees, and low back on August 29, 2012. Tr. at 473. Dr. Murphy prescribed an increased dose of Gabapentin and 100 milligrams of Tramadol. *Id.* She noted Plaintiff had received no relief from injections and referred her for physical therapy. *Id.*

On September 24, 2012, an MRI of Plaintiff's right knee showed intrasubstance degenerative signal in the medial meniscus, without a discrete tear; advanced patellofemoral osteoarthritic changes laterally with seven millimeters of lateral patellar subluxation; mild cartilage thinning and irregularity in the medial and lateral femorotibial compartments with some partial-thickness cartilage fibrillation of the medial femoral condyle; and a small ganglion cyst in the proximal tibia near the acromioclavicular ligament insertion. Tr. at 476.

On September 26, 2012, Plaintiff complained to Dr. Murphy of increased pain throughout her body. Tr. at 469. She indicated she had attempted to walk, but that walking increased her pain. *Id.* Dr. Murphy noted that Plaintiff's insurance would not cover physical therapy and that she appeared depressed. *Id.* She observed Plaintiff to

have pain on palpation and ROM of her bilateral knees, mild diffuse back tenderness to palpation, and several tender fibromyalgia points. Tr. at 471. She instructed Plaintiff to continue quadriceps strengthening exercises and regular exercise with stretching and strengthening of her low back. *Id.* She indicated Plaintiff should continue taking Tramadol and Neurontin and should use ice and heat as needed. *Id.* Dr. Murphy stated Plaintiff's depression was more severe than she generally addressed in her practice and that Plaintiff should follow up with her therapist for a possible medication change. *Id.*

Plaintiff presented to SJSFHC on October 19, 2012, with complaints of pain in her back, right knee, and hips. Tr. at 482. Walter Bonner, M.D. ("Dr. Bonner"), observed Plaintiff to have tenderness in her right knee and trochanteric bursa, but also noted the knee was stable and had no effusion and that her hips extended well. Tr. at 482. He administered a Methylprednisolone Acetate injection. Tr. at 538.

On October 24, 2012, an x-ray of Plaintiff's lumbar spine indicated stable mild lumbar spondylosis and atheroscelorosis. Tr. at 448.

Plaintiff reported pain in her hands and shoulders and urge incontinence on November 7, 2012. Tr. at 480. Dr. Peterson noted that Plaintiff was walking with a cane. *Id.* She increased Plaintiff's dosage of Pravastatin for elevated cholesterol and increased her dosage of Neurontin for fibromyalgia. *Id.*

On November 16, 2012, Dr. Peterson completed an application for Plaintiff to receive a disabled placard and license plate and issued a prescription for the same because of degenerative joint disease in her knee and back. Tr. at 502, 503.

State agency consultant Camilla Tezza, Ph. D., indicated the same mental limitations and level of impairment as Dr. Hamrick on November 26, 2012. Tr. at 113–14. She indicated Plaintiff was moderately limited with regard to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. Tr. at 118–20. She found that Plaintiff's mental symptoms and impairments were severe, but that they "would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 120.

On November 26, 2012, state agency medical consultant Jean Smolka, M.D., assessed the same physical RFC as Dr. Cain. Tr. at 115–18.

On December 14, 2012, Plaintiff complained to Dr. Bonner of pain in her back and right knee. Tr. at 536. She complained that her right knee pain was exacerbated by weight bearing. Tr. at 539. Dr. Bonner observed Plaintiff to be tender in her knees and lumbosacral spine and to have slight instability in her knees. *Id.* He assessed Plaintiff's diagnoses, symptoms, and limitations in a narrative form. Tr. at 169–71.

Plaintiff presented to Imagine Physical Therapy for an initial examination on January 31, 2013. Tr. at 504–06. She reported a lengthy history of back pain that caused her difficulty with most ADLs. Tr. at 504. Kena Shah, PT ("Ms. Shah"), indicated

Plaintiff "seems to be in a lot of pain." *Id.* She noted Plaintiff walked with an antalgic gait and used a single-point cane in her right hand. *Id.* Plaintiff reported pain with all lumbar ROM exercises and demonstrated reduced strength of 3+/5 in her bilateral lower extremities, 50% right and left lumbar rotation, and reduced hamstring flexibility. Tr. at 505. Ms. Shah recommended that Plaintiff engage in physical therapy three times a week for four weeks. *Id.*

On February 15, 2013, Plaintiff complained to Dr. Bonner of pain in her low back, bilateral knees, shoulder, and foot. Tr. at 535. Dr. Bonner observed Plaintiff to be tender to palpation in her bilateral shoulders, lumbosacral spine, and bilateral knees. *Id.* He assessed osteoarthritis of the knees and degenerative disc disease of the lumbosacral spine and instructed Plaintiff to continue taking Naproxen and Neurontin. *Id.*

Plaintiff reported no improvement in her left foot on February 21, 2013. Tr. at 528. Dr. Armstrong indicated Plaintiff had swelling around the medial side of her left foot and was tender to palpation in her left heel. *Id.* He recommended a knee walker and a cast. Tr. at 529.

Plaintiff complained of "a lot of pain" in the back of her left heel on March 7, 2013. Tr. at 526. Dr. Armstrong observed her to be very tender to palpation in the posterior aspect of her left heel, but noted no other abnormalities. *Id.* He assessed Achilles bursitis or tendinitis, placed Plaintiff in a short leg cast, and instructed her not to bear weight on the left foot. Tr. at 527.

Plaintiff attended several physical therapy sessions, but was discharged on March 11, 2013, because the cast on her left foot prevented her from adequately participating. Tr. at 507–16.

On March 15, 2013, Plaintiff complained to Dr. Bonner of pain in multiple sites. Tr. at 534. He assessed a chronic pain syndrome and moderate recurrent major depression. *Id.*

On March 28, 2013, Plaintiff reported to Dr. Armstrong that her foot continued to bother her. Tr. at 524. Dr. Armstrong noted that she had been non-weight bearing in a cast for the past two weeks. *Id.* He indicated Plaintiff had tenderness that was proximal to the prior incision site in her left posterior heel. *Id.* He instructed Plaintiff to wear a sandal or a boot and indicated she may need further debridement and removal of the left posterior calcaneus bone. *Id.*

Plaintiff complained to Dr. Bonner of back and ankle pain on July 19, 2013. Tr. at 533. Dr. Bonner noted tenderness and swelling in Plaintiff's ankle, but indicated an x-ray was negative. *Id.* He instructed Plaintiff to continue Naproxen and to follow up in four months. *Id.*

Plaintiff returned to Dr. Armstrong on July 24, 2013. Tr. at 595. She indicated she had injured her right ankle in a car accident on June 30. *Id.* Dr. Armstrong observed Plaintiff to have bruising and tenderness to palpation in her right ankle. *Id.* He diagnosed an ankle sprain and contusion, prescribed Lortab, and instructed Plaintiff to ambulate with a cam walker. Tr. at 596.

On August 14, 2013, Plaintiff indicated to Dr. Armstrong that she was doing better, but continued to have significant right ankle pain and weakness. Tr. at 592. Dr. Armstrong observed Plaintiff to be tender in her left heel and right ankle. *Id.* He referred her for physical therapy and instructed her to remain in the cam walker. Tr. at 593.

A physical therapy plan of care dated August 20, 2013, indicates Plaintiff had the following functional impairments: decreased bilateral ankle ROM; decreased bilateral ankle muscle strength; ambulates with limp; only able to ambulate short distances; unable to stand long periods; unable to climb stairs; painful to drive; increased fall risk; wearing right ankle boot; and ambulates with cane. Tr. at 598. The physical therapist recommended Plaintiff engage in physical therapy sessions twice a week for 90 days. *Id.*

On August 20, 2013, Plaintiff's case manager William Patterson, M.A. ("Mr. Patterson"), indicated Plaintiff had complained of chronic pain in her back and bilateral feet. Tr. at 559. Plaintiff reported spending most days in her bedroom and indicated she had added a sofa so that others could visit with her. *Id.*

On August 21, 2013, Plaintiff presented to Robert Blackwell, M.D. ("Dr. Blackwell"), for a pain management consultation. Tr. at 548–50. She complained of pain in her lower lumbar region, right hip, and right knee. Tr. at 548. Dr. Blackwell observed Plaintiff to have moderate swelling in her bilateral knees, lateral joint line tenderness in her bilateral knees, medial joint line tenderness in her right knee, right knee crepitus, and tenderness in her right and left greater trochanter. Tr. at 548–49. He assessed fibromyalgia, bursitis of the hip, ankylosis of the sacroiliac joint, knee pain, primary localized osteoarthritis of the lower leg, and lumbar and sacral arthritis. Tr. at 549. He

16

referred Plaintiff for an MRI of her bilateral knees, prescribed Mobic, increased Plaintiff's Neurontin dosage to 600 milligrams twice a day, and offered Plaintiff a right sacroiliac joint injection. *Id.*

On August 30, 2013, an MRI of Plaintiff's left knee indicated moderate osteoarthritis and a few foci of moderate to high grade chondromalacia in the patellofemoral compartment. Tr. at 553. An MRI of Plaintiff's right knee showed mild-to-moderate osteoarthritis of the right knee; a few foci of moderate to high grade chondromalacia in the patellofemoral compartment; and intrasubstance degeneration of the body and posterior horn of the medial meniscus. Tr. at 554.

Plaintiff complained to Dr. Armstrong of pain in her right heel and limited inversion and eversion of her right ankle on September 4, 2013. Tr. at 590. She reported pain with palpation of her lateral ankle ligaments and inversion of her right foot. *Id.* Dr. Armstrong observed Plaintiff to have good ROM of her ankle joints, but some pain. *Id.* He instructed Plaintiff to discontinue use of the cam walker and to use an ankle brace as she increased her activity level. Tr. at 591. He advised her to continue with physical therapy. *Id.*

On September 11, 2013, Dr. Blackwell referred Plaintiff back to Dr. Carroll for evaluation of her right knee. Tr. at 551. He noted the MRI showed a full thickness tear of Plaintiff's right medial meniscus. *Id.* He administered an injection to Plaintiff's sacroiliac joint. *Id.*

On September 30, 2013, Plaintiff followed up with Allison Swanson, PA-C ("Ms. Swanson"), in Dr. Carroll's office, regarding bilateral knee pain. Tr. at 586–89. She

stated she experienced daily pain and swelling. Tr. at 586. She also endorsed right wrist and hand pain and requested a brace. *Id.* Ms. Swanson observed Plaintiff to have medial and lateral joint line tenderness bilaterally, but to demonstrate no other abnormalities in her knees. Tr. at 587. She administered cortisone injections to Plaintiff's bilateral knees. Tr. at 588. Dr. Carroll subsequently met with Plaintiff to discuss the treatment options. *Id.* He recommended Plaintiff follow conservative treatment that included ice, activity modification, bracing, and cortisone injection. *Id.*

On October 2, 2013, Plaintiff reported to Dr. Armstrong that she had no pain in her ankle, but still had some swelling. Tr. at 583. She indicated her left heel had improved, as well. *Id.* Dr. Armstrong instructed Plaintiff to gradually increase her activity, use stretching exercises, and wear comfortable shoes. Tr. at 584.

Plaintiff followed up with Dr. Carroll for bilateral wrist and knee pain on November 4, 2013. Tr. at 578–81. Dr. Carroll noted that Plaintiff recently underwent foot surgery without relief. Tr. at 579. Plaintiff returned the braces that were provided at an earlier visit and indicated she did not like wearing them. *Id.* She stated she was unable to participate in physical therapy because being around a lot of people caused her to experience anxiety. *Id.* She indicated the injection to her left knee gave her complete relief, but that she continued to experience pain in her right knee. *Id.* She had medial and lateral joint line tenderness, but Dr. Carroll noted no other abnormalities. Tr. at 580. Dr. Carroll referred Plaintiff to a small physical therapy center that only worked with a few patients at a time and indicated he would proceed with Euflexxa injections. Tr. at 581.

On November 10, 2013, Mr. Patterson indicated Plaintiff stated her physical problems made her feel hopeless at times and were barriers to her mental success. Tr. at 560. Plaintiff reported a strained family relationship and indicated she was not happy with her current physical therapy regimen. *Id.* Mr. Patterson encouraged Plaintiff to use coping skills and to participate in activities to improve her mood. *Id.*

Plaintiff presented to Ms. Swanson on November 11, 2013, for a Euflexxa injection. Tr. at 573. She continued to report bilateral hand pain. *Id.* She indicated she had been unable to attend physical therapy because of her anxiety. Tr. at 575. Ms. Swanson noted medial and lateral joint line tenderness, but no other abnormalities. *Id.*

Plaintiff presented to Ms. Swanson for a third Euflexxa injection to her right knee on December 11, 2013. Tr. at 568. She reported some improvement, and Ms. Swanson noted no abnormalities on examination. Tr. at 570.

Plaintiff followed up with Dr. Christie on January 23, 2014. Tr. at 561–62. Dr. Christie observed her to be moving slowly, but doing fairly well. Tr. at 561. Plaintiff reported some family problems over the holidays. *Id.* Dr. Christie noted Plaintiff's bursitis-related pain had increased and that she was using a Morphine patch that seemed to make it difficult for her to focus on the discussion. *Id.* He specified that he had to repeat many questions during their conversation. Tr. at 562.

Plaintiff followed up with Ms. Swanson on February 5, 2014. Tr. at 563–67. She reported pain and inflammation in her knee and indicated the Euflexxa injections provided minimal relief. Tr. at 563, 565. Ms. Swanson observed Plaintiff to have medial and lateral joint line tenderness, but to be neurovascularly intact and to have no effusion.

Tr. at 565. X-rays of Plaintiff's right knee showed severe patellofemoral degenerative joint disease. Tr. at 566 and 597. Plaintiff indicated she was opposed to surgical intervention and additional physical therapy. *Id.* She stated she desired to continue with a home exercise program. Tr. at 567. Ms. Swanson referred Plaintiff for an arthritis workup and indicated she should follow up in six to eight weeks. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

At the hearing on March 6, 2014, Plaintiff testified she stopped working after she developed anal fissures in February 2012. Tr. at 43. She indicated she had two surgeries. Tr. at 44. She stated she subsequently fell and fractured her tailbone. *Id.* She indicated she developed low back pain after her fall. Tr. at 45. She described the pain as radiating into her hips and occasionally into her thighs. Tr. at 45–46. She indicated she had bursitis in her bilateral hips. Tr. at 46. She stated she had fibromyalgia that caused her to feel achy throughout her body and to urinate 20 times per day. Tr. at 50. She endorsed problems with bowel and bladder incontinence. Tr. at 51–52. She indicated she had left carpal tunnel syndrome and arthritis in the knuckles of her bilateral hands. Tr. at 52. She stated she had arthritis in her bilateral knees. Tr. at 53. She indicated her left knee felt worse than her right, but that her doctor had advised right knee surgery. *Id.* She stated she had undergone a past surgery to her left heel to remove heel spurs. Tr. at 54. She indicated she required another surgery to treat her left foot. *Id.* She confirmed that she was diagnosed with depression, anxiety, and PTSD. Tr. at 55.

Plaintiff testified that she experienced pain in her back and knees after walking for 15 minutes. Tr. at 47. She indicated she could sit for 30 minutes to an hour at a time. Tr. at 47–48. She stated she could stand for 10 minutes. Tr. at 49. She indicated she walked with a cane because her gait was "wobbly." Tr. at 50. She estimated she spent six days per month in bed because of her pain. Tr. at 55. She endorsed some difficulty with buttoning buttons, typing, and lifting a coffee pot. Tr. at 57. She denied experiencing side effects from her medications. Tr. at 55–56.

Plaintiff testified she had difficulty sleeping. Tr. at 48. She indicated her pain caused her to wake six or seven times during a typical night. Tr. at 48–49. She stated she last drove two weeks earlier and did not like to drive. Tr. at 52–53. She stated she could vacuum one room at a time, prepare small meals, and clean her bedroom and bathroom. Tr. at 58–59. She testified she did laundry with her brother's assistance. Tr. at 62. She indicated she no longer attended church because she did not like being around large groups of people. Tr. at 60. She stated she sometimes had panic attacks in group settings. Tr. at 61.

2.    The ALJ's Findings

In his decision dated May 6, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2014.
2.    The claimant has not engaged in substantial gainful activity since February 28, 2012, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, right hip arthritis, bilateral knee osteoarthritis,

fibromyalgia, coccygeal fracture, obesity, anxiety, depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the additional limitations of no climbing of ladders, ropes and scaffolds and occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. The claimant is able to understand, remember and carry out simple instructions in situations that do not require more than rare interaction with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 5, 1961 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–30.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not adequately assess Plaintiff's severe impairments at step two;

2) the ALJ did not consider the combined effect of Plaintiff's impairments; and

3)    the ALJ did not adequately consider Plaintiff's treating physicians' opinions.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

23

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Step Two Findings

Plaintiff argues the ALJ failed to consider that she had a history of surgery to her heel and Achilles tendon and continued to be limited by pain in her foot. [ECF No. 13 at 10]. She maintains the ALJ did not account for her foot pain in assessing her RFC. *Id.* She contends the record reflects evidence of tenderness and discomfort in her heel and mental stress related to the impairment. [ECF No. 16 at 2], citing Tr. at 370–71, 456–57, and 462–63).

The Commissioner argues the ALJ did not err in assessing Plaintiff's impairments at step two because he proceeded beyond step two in evaluating the effect of her impairments. [ECF No. 15 at 5]. She maintains that Plaintiff has failed to cite any evidence that supports her allegation of functional limitations as a result of foot pain. *Id.* at 5–6.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p.

26

A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.[3]").

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by the individual's impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental

---

[3] Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

limitations and restrictions, including those that result from severe and nonsevere impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The record reflects that Plaintiff was diagnosed with Haglund's deformity to her left heel, a right ankle sprain, a left calcaneal spur, and left Achilles bursitis/tendinitis during the relevant period. *See* Tr. at 369 and 370. Plaintiff underwent surgery to debride her left Achilles tendon and remove a calcaneal heel spur on June 28, 2012, but continued to report pain in her heel during the recovery period. *See* Tr. at 393–94, 462, and 469. She complained to Dr. Bonner of left foot pain again on February 15, 2013, and he referred her back to Dr. Armstrong, who placed her in a cast and instructed her not to bear weight on her left foot. *See* Tr. at 526, 528, and 535. On March 28, 2013, Dr. Armstrong indicated that Plaintiff may need further debridement and removal of the left posterior

28

calcaneus bone. Tr. at 524. Plaintiff subsequently sprained her right ankle and complained of bilateral foot pain, and Dr. Armstrong referred her for physical therapy. Tr. at 592–93. On August 20, 2013, a physical therapy plan of care indicated Plaintiff had significant functional limitations as a result of impairments to her bilateral feet. Tr. at 598. These functional limitations included inabilities to ambulate more than short distances, stand for long periods, and climb stairs, as well as an increased risk of fall and the need to ambulate with a cane. *Id.*

Despite significant evidence of record regarding the impairments to Plaintiff's left foot and the functional limitations they imposed, the ALJ did not consider the impairments to be severe. *See* Tr. at 20. Although he explained his reasons for assessing several of Plaintiff's other impairments as nonsevere, he provided no similar explanation with regard to Plaintiff's left foot impairment. *See* Tr. at 20–21. The ALJ recognized that Plaintiff had left Achilles surgery in June 2012, but found she was "doing fine" by July 2012. Tr. at 26. He stated "examinations throughout the record" had "failed to reveal evidence of any significant functional deficits." *Id.* While the ALJ noted Plaintiff routinely had tenderness to palpation in her left foot, he stated she had no muscle or sensory deficits, no edema, and good ROM. *Id.* He found that Plaintiff was "capable of performing light work with no climbing of ladders, ropes and scaffolds and occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling" and determined "[t]hese limitations sufficiently take into account the physical limitations resulting from the claimant's degenerative disc disease, right hip arthritis, bilateral knee osteoarthritis, fibromyalgia and coccygeal fracture." Tr. at 27.

29

The ALJ determined Plaintiff had no "significant functional deficits" even though the evidence suggested the impairments to Plaintiff's left foot resulted in pain, decreased ROM and muscle strength in her ankle, and reduced abilities to stand, walk, climb stairs, and balance. *Compare* Tr. at 26 and 559, *with* Tr. at 598. He specified that the RFC assessment was based on the limitations he found to be imposed by Plaintiff's degenerative disc disease, right hip arthritis, bilateral knee osteoarthritis, fibromyalgia and coccygeal fracture, but did not specifically indicate he considered the impairments to Plaintiff's left foot in assessing her RFC. *See* Tr. at 27. The ALJ assessed an RFC that required Plaintiff to stand and walk for six hours out of an eight-hour day and occasionally balance and climb ramps and stairs. *See* Tr. at 27. Although he acknowledged Plaintiff's testimony that she could stand for 10 minutes and walk for 15 minutes at a time, the ALJ's decision is devoid of reference to evidence in the record that Plaintiff's left foot impairments precluded her from meeting the standing and walking requirements of light work. *Compare* Tr. at 25, *with* Tr. at 49, 317, 469, 504, and 598; *see also* SSR 96-8p. He also failed to resolve that evidence with his finding that Plaintiff could meet the exertional requirements of light work *See Mascio*, 780 F.3d at 636; SSR 96-8p. In light of the foregoing, the undersigned recommends the court find the ALJ failed to consider the severity and functional effects of the impairments to Plaintiff's bilateral feet at step two or in subsequent steps.

## 2. Combined Effect of Impairments

Plaintiff maintains that the ALJ's statement that he had considered her impairments in combination was not supported by his decision. [ECF No. 13 at 11]. She

maintains the ALJ failed to explain why her impairments were not equivalent to any Listings. *Id.* She contends the ALJ erroneously found that her RFC was not compromised by her combination of impairments because they did not meet the level of severity indicated in the Listings. *Id.* She argues the ALJ did not explain the cumulative effect of her impairments on her ability to perform key functions at the light exertional level. *Id.* at 12. She contends the ALJ failed to consider whether her physical impairments exacerbated her mental impairments and symptoms. *Id.*

The Commissioner argues the ALJ's decision reflects his consideration of the combined effect of Plaintiff's impairments. [ECF No. 15 at 7]. She maintains Plaintiff cited no particular Listings that the ALJ neglected to consider and presented no medical evidence that suggested her impairments met a Listing. *Id.* at 8. She contends the ALJ's RFC assessment accounted for all of Plaintiff's credibly-established physical and mental limitations. *Id.* at 9.

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and her disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42

U.S.C. § 423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* However, the Fourth Circuit has declined to elaborate on what serves as an "adequate" explanation. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). This court has specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Furthermore, absent evidence to the contrary, the courts should accept the ALJ's assertion that he has considered an issue. *Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

The ALJ stated he had considered the combined effect of Plaintiff's severe and nonsevere impairments and had concluded that they were not at least equal in severity to those described in Listings 1.00, 2.00, 3.00, 4.00, 5.00, 6.00, 12.02, 12.04, 12.06, and 14.00. Tr. at 23. He indicated he had "specifically considered the cumulative effects of the impairments on the claimant's ability to work." *Id.* He found that the combination of degenerative disc disease of the lumbar spine, right hip arthritis, bilateral knee

osteoarthritis, fibromyalgia, coccygeal fracture, obesity, anxiety, depression, high blood pressure, PTSD, history of ulcer and status-post anal fissure repair had "not resulted in the equivalence of any of the Listings, as the evidence shows that the claimant is able to perform routine movement, consistent with the residual functional capacity stated below, to sustain function over an 8-hour day." *Id.* He indicated the combination of Plaintiff's impairments did not limit her "ability to ambulate effectively or perform fine and gross movements to carry out her activities of daily living and work at the residual functional capacity below." *Id.* He stated there was "no evidence to suggest that the claimant is unable to perform all of the mental activities generally required by competitive, remunerative, unskilled work." *Id.* He concluded that Plaintiff's treatment records did not demonstrate that she could not perform work at the assessed RFC. *Id.*

The ALJ's statements that he considered Plaintiff's impairments in combination in determining whether they equaled a Listing and in assessing her RFC raised a presumption that he adequately considered the combined effect of her impairments under the Fourth Circuit's standard. *See* Tr. at 23; *see also Reid*, 769 F.3d at 865. However, adequate consideration of the combined effect of an individual's impairments requires consideration of all the individual's impairments. *See Walker*, 889 F.2d at 50. The ALJ's failure to consider the severity of and limitations imposed by Plaintiff's left foot impairments undermined the presumption that he had adequately considered the combined effect of Plaintiff's impairments. The presumption was further eroded by the ALJ's failure to explain how the RFC he assessed was consistent with the severe impairments he found Plaintiff to have and the evidence of record. *See* Tr. at 24. He

indicated he considered Plaintiff's mental and physical impairments separately in assessing her functional limitations and his explanation reflects no consideration of evidence of record that suggested Plaintiff's mental limitations were exacerbated by her physical impairments. *See* Tr. at 353 (reporting increased anxiety because of medical appointments), 456 (indicating surgery had increased her stress and caused her to have several emotional breakdowns over the past month), 560 (stating her physical problems made her feel hopeless at times and were barriers to her mental success), 561 (noting Plaintiff had difficulty focusing on the discussion during the therapy session because she was using a Morphine patch for pain), and 575 (expressing inability to attend physical therapy because of anxiety around others). In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately consider the combined effect of Plaintiff's impairments.

### 3.    Treating Physicians' Opinions

On November 16, 2012, Dr. Peterson completed an application for Plaintiff to receive a disabled placard and license plate. Tr. at 502. She indicated Plaintiff had "an inability to ordinarily walk one hundred feet nonstop without aggravating an existing medical condition, including the increase of pain" and "an inability to ordinarily walk without the use of or assistance from a brace, cane, crutch, another person, prosthetic device, wheelchair, or other assistive device." *Id.* She stated Plaintiff's disability was permanent. *Id.*

On December 14, 2012, Dr. Bonner indicated he had examined Plaintiff during monthly visits on October 19, 2012, November 16, 2012, and December 14, 2012. Tr. at

169. He identified Plaintiff's impairments as osteoarthritis of the bilateral knees, plantar fasciitis of the bilateral feet, degenerative disc disease, fibromyalgia, and trochanteric bursitis. *Id.* He indicated Plaintiff experienced moderate pain in her knee, low back, hip, and heel that was increased by activity. *Id.* He stated he had been unable to completely relieve Plaintiff's pain with medication. *Id.* He indicated Plaintiff could sit for six hours and stand/walk for zero to two hours during an eight-hour day. *Id.* He recommended Plaintiff not sit continuously during the workday. *Id.* He stated Plaintiff could never lift 20 pounds and could rarely lift 10 pounds or less. *Id.* He indicated Plaintiff had significant limitations in doing repetitive reaching, handling, fingering, or lifting. Tr. at 170. He stated Plaintiff required a cane for occasional standing and walking. *Id.* He indicated Plaintiff's impairments had lasted or were expected to last for a period of 12 months or more. *Id.* He stated Plaintiff's condition interfered with her ability to keep her neck in a constant position. *Id.* He recommended she avoid stooping, kneeling, pulling, bending, and heights. *Id.* He recognized that Plaintiff had psychological limitations and indicated that emotional factors contributed to the severity of her symptoms. Tr. at 170–71. He stated Plaintiff was incapable of low stress jobs because of her anxiety and chronic pain. Tr. at 171. He estimated Plaintiff would likely be absent from work more than three times per month because of her impairments or treatment. *Id.*

Dr. Peterson completed a second physician's statement on August 30, 2013. Tr. at 543–44. She indicated Plaintiff's disability was permanent and that she was unable to work or to participate in activities to prepare for work. Tr. at 543.

Plaintiff argues the ALJ dismissed her treating physicians' opinions without considering them in light of the criteria in 20 C.F.R. §§ 404.1527(c) and 416.927(c). [ECF No. 13 at 15]. She maintains that the ALJ based his decision to discount her physicians' opinions on flawed logic. *Id.* She argues that because "severe impairments" are defined as impairments that cause significant functional limitations, the ALJ's finding that she had no evidence of significant functional limitations was contrary to his finding that she had severe impairments. *Id.*

The Commissioner argues that substantial evidence supports the ALJ's weighing of the opinion evidence. [ECF No. 15 at 10]. She maintains the ALJ properly gave Plaintiff's treating physicians' opinions little weight because they were inconsistent with the evidence of record. *Id.* at 11–12. She contends the ALJ considered that Dr. Bonner had only examined Plaintiff on three occasions. *Id.* at 12. She argues Dr. Peterson provided no specific functional limitations and that her statement that Plaintiff was "permanently disabled" was entitled to no weight because it was an opinion on an issue reserved to the Commissioner. *Id.* at 12–13.

ALJs must consider all medical opinions of record. 20 C.F.R. §§ 404.1527(b), 416.927(b). The regulations require that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. §§

404.1527(c) and 416.927(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it not entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004)[4]; *see also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

The ALJ must give good reasons for the weight he accords to the treating source's opinion. SSR 96-2p. The notice of decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* However, it is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ stated he considered the medical opinions of Plaintiff's physicians pursuant to 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p and 96-6p. Tr. at 28. He indicated that Dr. Bonner had reported that Plaintiff was unable to perform full-time, competitive work on a sustained basis and that Dr. Peterson stated Plaintiff was unable to work because of osteoarthritis of her knee, degenerative disc disease, fibromyalgia, and depression. *Id.* He stated he gave little weight to the opinions of Drs. Bonner and Peterson because their assessments were "not consistent with the evidence as discussed above." *Id.* He indicated that despite Plaintiff's "many severe impairments, there was no evidence of any significant functional limitations." *Id.*

A review of ALJ's reasons for discounting the treating physicians' opinions reveals them to be insufficient in light of the provisions of 20 C.F.R. §§ 404.1527(c) and

416.927(c) and SSRs 96-2p and 96-6p. While the Commissioner advances several additional reasons for rejecting Plaintiff's treating physicians' opinions, the undersigned cannot be persuaded by these arguments because they were not offered by the ALJ. *See Hall v. Colvin*, No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. Mar. 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The ALJ cited a lack of consistency between the opinions rendered by Drs. Bonner and Peterson and the medical evidence of record, but he failed to explain how their opinions were inconsistent with the record as a whole. *See* Tr. at 28. The ALJ recognized that Drs. Bonner and Peterson provided general opinions that Plaintiff was unable to work. *See id.* However, he failed to acknowledge the specific functional limitations they assessed that were relevant to Plaintiff's RFC. *See* Tr. at 169–71 (indicating Plaintiff was limited to sitting for six hours in an eight-hour workday; standing/walking for zero to two hours during an eight-hour workday; must avoid continuous sitting; should never lift 20 pounds; should rarely lift 10 pounds or less; must avoid repetitive reaching, handling, fingering, or lifting; required a cane for occasional standing and walking; must avoid keeping her neck in a constant position; must avoid stooping, kneeling, pulling, bending, and heights; was incapable of low stress jobs; and was likely to be absent from work more than three times per month because of her impairments or treatment), 502 (indicating that Plaintiff could not walk more than 100 feet nonstop without aggravating

her impairments and noting that she required an assistive device to ambulate). Although the ALJ did not address these specific functional limitations, he concluded that the record contained no evidence of any significant functional limitations. *See* Tr. at 28. This finding was contrary to his findings that Plaintiff had severe impairments and had the RFC for a reduced range of work. *See* Tr. at 20, 24; *see also* 20 C.F.R. §§ 404.1520(c). While it is possible that the ALJ meant that the record did not support the significant functional limitations that Drs. Bonner and Peterson endorsed, he failed to address the specific limitations in turn and to explain why they were inconsistent with the record.

The ALJ's explanation of his decision to accord little weight to the opinions of Drs. Bonner and Peterson reflects no consideration of the four other factors identified as important in 20 C.F.R. §§ 404.1527(c) and 416.927(c). In finding that the treating physicians' opinions were inconsistent with the other evidence of record, the ALJ declared them inconsistent with the other evidence of record, which is a sufficient reason for declining to accord controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. However, an ALJ's analysis of a treating physician's opinion does not end with a finding that it is not entitled to controlling weight. *See id.* The ALJ must proceed to weigh the opinion based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). Because the ALJ's decision reflects no consideration of the treating and examining relationships between Plaintiff and Drs. Bonner and Peterson, the supportability of their opinions in their own records, or the specialization of either physician, it is insufficient.

In light of the absence of sufficient reasoning or evidentiary support for the ALJ's decision to accord little weight to the treating physicians' opinions, the undersigned recommends the court find he inadequately considered the medical opinions.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 31, 2016                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).